On today's docket, we have calls number 23-40671, State of Texas, State of Mississippi, State of Louisiana v. President Joseph R. Biden. Obviously, the appellant is ready to proceed. You may. Good afternoon, Your Honor. May it please the Court, Daniel Winnick for the federal government. The executive order that's challenged here doesn't set a minimum wage for all American companies. It doesn't even set a minimum wage for all companies that do business with the federal government. Rather, it instructs federal agencies that when they enter into a contract, they should do so only with companies that employ their workers, a specified wage for the particular hours that those workers spend working on or in connection with that contract. The order reflects the president's view, not as a regulator, but as the manager of the internal operations of the executive branch, that the federal government is better off when employees are sufficiently paid for the work that they do on or in connection with its contracts. This isn't a novel requirement. It's been in place across three administrations. And presidents have, for more than a half century, issued similar orders directing agencies to include in their contracts provisions that address how contractors must hire, pay, and manage employees, ranging from anti-discrimination requirements to labor rights requirements. As the Tenth Circuit recently held in the Bradford case, this requirement falls well within the president's authority under Section 121A to prescribe policies and directives that he considers necessary to carry out this subtitle, which is to say, the set of contracting and property management functions governed by the relevant provisions of Titles 40 and 41. The president determined that the requirement would bolster economy and efficiency in federal procurement because a higher minimum wage enhances worker productivity and generates higher— Counsel, I'm not sure if I'm not understanding you because I'm not hearing you or maybe you're speaking just a little faster than my southern ear listens, but I need you to raise your voice, please, and— Of course. The president determined that this requirement would bolster economy and efficiency in federal procurement because a higher minimum wage enhances worker productivity and generates higher quality work by boosting health, morale, and effort, reducing absenteeism and turnover, and lowering supervisory and training costs. That rationale is well supported by social science, which is summarized by the department in the preamble of the implementing rule. The department expected that higher wage costs borne by contractors would be offset by benefits to the contractors from higher productivity and so forth, and to the extent contractors do experience any net increase in labor costs and to the extent they pass any of that increase through to the federal government, the department expected that that cost increase would be negligible and that it would be offset by benefits to the government from the payment of a higher wage, like, again, provision of higher quality work by the employees performing on federal contracts. The government benefits when contractors' employees produce higher quality work on its contracts. Now, plaintiffs suggest that this requirement can't possibly benefit economy and efficiency because it might mean spending just a bit more on federal contracts, but economy and efficiency are terms that talk about value, not just about cost, and all of us are familiar with that concept just sort of in our daily lives. If you're hiring a contractor to fix a leak in your roof, you might have a choice between a contractor who's going to charge you $10,000 and a contractor who's going to charge you $11,000, and the difference between the two may be that the cheaper bid is cutting costs on labor, and you may well decide that it is more economical and efficient to hire the slightly higher-priced contractor if you think that that contractor is going to pay its workers better and that they're therefore going to do higher quality work that is going to mean lower repair and replacement costs for you in the long run. That is an economical and efficient choice. Plaintiffs also ask this court to embrace the Sixth Circuit's view that Section 121A serves only a gap-filling function, allowing the president to issue directives that effectuate provisions elsewhere in the statute, but that interpretation of the statute is not only inconsistent with decades of precedent from all three branches of the government, including this court's decisions in Knopsey and Mississippi Power and Light, it's plainly at odds with the statutory text. The statute allows the president to prescribe policies and directives that he considers necessary to carry out the subtitle so long as they are consistent with the subtitle. If directives necessary to carry out the subtitle were limited to those that effectuate specific provisions elsewhere in the statute, then they would definitionally be consistent with the subtitle. If you're carrying out statutory provisions elsewhere in the statute, that's of course consistent with the subtitle. So in order to do any work, the phrase consistent with the subtitle has to limit in some way the president's authority to issue directives that are, in his view, necessary to carry out the subtitle. And what that means is that the president has to have the authority to issue directives like this one that go beyond simply effectuating provisions elsewhere in the subtitle, that instead... So I think there are two limiting principles to the position we're taking here. One, of course, the broader limiting principle of all of the president's directives under Section 121A is that they have to be consistent with the subtitle, which means they can't go against some provision of the subtitle, and they have to be consistent with the objective set forth in Section 101, the objective of economy and efficiency. And the president has discretion in determining what advances economy and efficiency, but that is a limit. There's a second limit to the directive in this case, which is an important one and which sets this directive apart from the vaccine requirement that this court held invalid in the Louisiana case. Unlike that vaccine requirement, which the court regarded as going beyond just the terms of carrying out a federal contract, this requirement here is specific to the terms on which contractors perform the work they've agreed to do for the federal government. All it does is say when an agency contracts for the performance of construction work or other services, it should do that with companies that are going to pay a certain minimum wage for the time that employee's been working on that contract. So that's very different from the vaccine requirement, which this court saw as effectively regulatory in nature because, as it said, a vaccine can't be undone at the end of the work day, and because the requirement applied not just to the workers who were working on or in connection with federal contracts, but to anybody who shared a workplace with them. So that's why the assertion of the 121 power here is much narrower than in the vaccine case and why the court's decision in Louisiana, which rested on the major questions doctrine, is distinguishable here. If I might briefly return to sort of the question of the Sixth Circuit's view. So as I said a moment ago, the text of the statute and the phrase consistent with, I think, can only be read to support our understanding of the statute as allowing the president to direct agencies as to how they're supposed to carry out the set of contracting and property management functions covered by the subtitle. I don't think the text of the statute can be consistent with the Sixth Circuit's view that all the president can do is effectuate specific provisions elsewhere in the subtitle. The Sixth Circuit's view is inconsistent not just with the text, but with decades of precedent from this court and other courts and Congress's ratification of those precedents. So starting with this court's precedent, the decisions in Knopsy and Mississippi Power and Light, which held that the Procurement Act, as well as other statutes, authorized anti-discrimination executive orders. The analysis in those cases doesn't look anything like the one the Sixth Circuit employed. The D.C. Circuit's decision in Kahn, the Third Circuit's decision in Contractors Association, all of those cases for decades approving the president's exercise of authority under this provision that would be sort of unrecognizable on the Sixth Circuit's view. And Congress, when it recodified the relevant— Let me ask you this, counsel. Other than this court's decision in Louisiana v. Biden involving the vaccines, how many instances have you found where executive orders have been challenged and deemed to be illegal by any other circuit courts? So the vaccine executive order is the only one I'm aware of that's been held invalid. The Fourth Circuit has a particular application of an executive order invalid, but they didn't hold the executive order invalid on its face. That was the anti-discrimination executive order, and all they said was that it was too attenuated as connected to the facts in this case. The vaccine executive order is the only one that's been held invalid. And again, there's a decades-long history of the president construing this power broadly, courts upholding the exercise of that power. The only court to take a different view has been the Sixth Circuit. There's a single-judge opinion of the Eleventh Circuit, which plaintiffs cite as if it's the opinion of the court in that case, but it commanded only the vote of the authoring judge. Neither of the other judges on the panel joined that opinion. And again, I think that's the consensus view of the courts on this point is consistent with the text of the statute, and it's consistent with Congress's decision in 2002 to recodify the relevant provisions of the Procurement Act, which, as the Supreme Court said in Lorillard, ratifies the consensus view among the courts at that point. I might just speak briefly about the major questions doctrine, which was the only basis on which this court held the order in Louisiana invalid. There's three basic reasons it doesn't apply here. The first is that, as the Tenth Circuit recently explained in the Bradford case, this isn't a case where the executive branch is locating an expansive power in modest words or provisions. This is a broad authority. It's always been understood as broad. The second is that the effects of the order at issue in this case are quite small in relation to the cases where the Supreme Court and this court have applied the major questions doctrine. So the estimated cost of this order, in terms of the higher wages paid by federal contractors, is something like $1.7 billion a year. That's not a small number, but it's a drop in the bucket of federal contracting, and it is a tiny fraction of the costs of the agency actions to which the Supreme Court has applied the major questions doctrine in cases like West Virginia and Nebraska versus Biden. The same is true of the number of workers who are affected. So this order was expected to raise the wages of about 327,000 workers. It's about a fifth of 1% of the U.S. workforce, and it's about a thirtieth of the number of workers expected to be affected by the CMS vaccination requirement, which the Supreme Court upheld in Biden versus Missouri without discussion of the major questions doctrine. And the third point, an important point, is that as this court recognized in Bradford, this order, quote, simply reflects the president's management decision that the federal government will do business with companies only on terms he regards as promoting economy and efficiency. This is an exercise of proprietary authority, not an exercise of delegated legislative authority. And that's crucial because the underpinnings of the major questions doctrine is that it limits, it's sort of consistent with non-delegation principles, it limits the ability of agencies to carry out delegated legislative power. And that is not what the president is doing here. He is simply instructing federal agencies as to the terms on which they should enter into contracts, terms that the president thinks will benefit the government, that couldn't lie closer to the heart of the president's authority as the manager of the executive branch in carrying out the executive branch's proprietary functions. And again, this court in Louisiana rejected an argument that the requirement there was an exercise of proprietary authority, but it did so in a way that is clearly distinguishable here. It said that the reason it didn't think of the vaccination requirement as proprietary was that the requirement went beyond the particular hours that workers spent working on or in connection with federal contracts. It applied to workers in the same workplace, even if they weren't working on or in connection with federal contracts. And it applied obviously to all of the hours that they worked and for that matter, to all of their other hours, because again, a vaccination can't be undone at the end of the workday. And the court explicitly said that the distinction between proprietary and regulatory authority could have greater force as applied to a directive that was within the president's proprietary authority that was sort of more narrowly limited and more internally facing. And that is exactly what this executive order does. I'm happy to take any further questions the court may have. Otherwise, I'll reserve the remainder of my time for rebuttal. Thank you, counsel. Thank you. Thank you. May it please the court, Aaron Nielsen on behalf of Texas and the other states. It's no secret that the United States Supreme Court is highly skeptical where the president relies on a general and old statute for a controversial policy that Congress refused to enact. The court will be hard pressed to find a more clear example of that. Today, I'd like to make three broad points, if I may. First, the wage mandate is contrary to black letter rules of interpretation from this court and the United States Supreme Court. Second, the court should reject the DC circuit's close nexus test, which is irrelevant anyway. And third, this is a major question, and they have not offered a limiting principle at all to your point, Judge Clement. First, I would like to start with the text of the statute. The wage mandate rests on two provisions of the Procurement Act, section 101 and section 121. Section 101, however, is simply a statement of purpose. This court has held, most recently and after VHHS, last year, Judge Clement, you were on that panel, that you can't rely on a statement of purpose for substantive authority. That's consistent with the Supreme Court's decision in Surgeon from a few years ago. So they say, OK, OK, it's not about section 101. It's about section 121. Section 121 doesn't work either, respectfully. And we know that because it is a necessary and proper clause, one of more than one in the statute. And as a necessary and proper clause, this court has held, repeatedly, cannot itself be a fount of substantive authority. Again, I urge the court to read the statute at issue and after from just last year. Look at the court's decision in 2020 in Gulf Fishermen. Look at the court's decision in 2015 in Central Farm, in Contender Farms, rather. And look at the court's decision in 1983 in Central Forwarding. All of these cases say that you can't use a necessary and proper clause unless there is some specific provision in the statute that you are implementing. The government's view is contrary to all of those cases of this court. And to make the point especially clear, last year in the Commonwealth decision from the Sixth Circuit, the Sixth Circuit asked counsel for the government, putting aside the Procurement Act, in the entire United States Code, can you identify a single case where any court has said you can combine a purpose statement with a necessary and proper clause and get substantive authority. And the United States cannot identify a single statute in the entire United States Code. They also have not identified a statute in their briefing to this court. This is truly extraordinary. This is not how courts read statutes. So if I may, I'd like to turn to the second part of my argument, which is why the court should not adopt the D.C. Circuit's close nexus test. Because they can't rely on ordinary tools of interpretation, they asked the court to do something truly extraordinary. And that's go back in time 45 years to the D.C. Circuit's decision in Cannes. And there, in that case, the court said, rather than looking at the text of the statute the way that this court looks at it, in the cases that I've already said, they said, instead we're going to look at the values of efficiency and economy. And the court said, we're going to rely on legislative history, and we're going to rely on the purpose of the statute, and we're going to have broad deference to the executive. I asked the court to pick up Chief Justice Robert's decision in Loebert Wright from six weeks ago, less than six weeks ago, on one hand, and pick up Chief Judge Skelly Wright's decision for the D.C. Circuit 45 years ago, look at them, and see if they can be reconciled. They cannot. That is not how this court reads statutes anymore, and it's certainly not how the United States Supreme Court reads statutes anymore. A few years ago, the Supreme Court had another case where they also had another similarly old rule from the D.C. Circuit, and they said, we're going to reject it as a relic from a bygone era of statutory interpretation. We also pointed out in our own briefs that recently, the D.C. Circuit, again, took one of its own rules, en banc, this rule was from the 1960s, and they said, that's not how we read statutes anymore. Instead, we pay attention to the text of the statute, and we don't rely on purpose and deference. Well, that's, that's exactly what we have here. But here's the thing, even worse. Say that the court were to adopt the close nexus test. This still loses. The D.C. Circuit said there's two limits on the close nexus test. One, there has to be a, the use of the Procurement Act has to be a direct and immediate effect on lowering procurement costs. Direct and immediate. And two, you can't use the procurement power to do something that Congress considered but rejected. Here, the wage mandate flunks both of those limits. As to the first, uh, in, um, Conn, the D.C. Circuit case, that was an anti-inflationary measure. The court said, uh, the President said, you have to not raise wages. And the D.C. Circuit said, well, yeah, if you don't raise wages, well, then that means the government's procurement costs aren't going to go up. That's a direct and immediate effect of limiting wage increases. This is the opposite. Rather than limiting wage increases, it's increasing wage increases. Well, of course that's going to raise the government's procurement costs. The government says, ah, but the quality will be higher. Well, what's their causational chain? I count at least five steps in their causation chain. If the minimum wage goes up, people, employees will be happier. If employees are happier, then they will stay at their job longer. If they stay at their job longer, they'll get better at their job. If they get better at their job, they'll do higher quality work. And if they do higher quality work, the United States will be able to purchase higher work at a lower price than if they had just bought higher quality work to begin with. There's problems with each step in that causational chain, but for purposes here, that's surely not— But aren't there studies that indicate that that's how it works? In other words, aren't there studies that indicate that you get those results when you pay higher wages? I don't want to fight on this ground here. We've preserved our arbitrary and capricious argument in the district court. I would point the court to the Pacific Legal Brief, which says that the studies don't say that. But for my purpose, what I'm here is I want to go back to the contest, direct and immediate. Now, maybe they're right. We don't think they are. We think there's a whole bunch of problems with that. But for assuming arguendo that they are right, surely— I'm listening for the answer to my question. My question was a simple one. Aren't there studies that say those are the results which obtain if you pay higher wages? They cite studies. The Pacific Legal Foundation Brief explains why the studies do not say what they say. So the answer that we submit is no. That's the arbitrary and capricious argument that the district court didn't resolve. So we haven't briefed that. I'm happy to brief that if it would help the court. But my point is only under a con that fails because that's not—call it whatever you want—that's not a direct and immediate effect. It's a five-step process to get there that is not direct and it's not immediate because it takes time for them to say people are going to stay at their job longer and they're going to become happier and do better work. Under a con itself, the test they asked this court to adopt, this would lose. And I'd point the court to the Fourth Circuit's decision in Liberty Mutual, which they talk about. There they say sometimes it just becomes too attenuated. I submit that this is too attenuated. It's too many steps. But say I'm wrong about that. There's another limitation in con itself. This is footnote 50. The court said there, look, we're not going to endorse the idea that the president can use the Procurement Act to do something that Congress considered and rejected. And here we know what happened. This is an ancient history. This is 2020. The president ran on a platform of raising the minimum wage to $15. And he was elected. And then he went to Congress and he said, Congress, raise it to $15. And Congress said, no, we're not going to do it. The Congressional Budget Office, to go back to your points, your Honor's question, the Congressional Budget Office said, if we do this, you will increase unemployment. That's what the Congressional Budget Office said. And after they said it, a bipartisan group of senators said, we are not going to, we're not going to do this. And as soon as that happened, you know, there's protests. We're still seeing the effects of that in today's politics, of that decision. The president said, okay, well, I'm going to use the Procurement Act and do it. That's, again, look at footnote 50 of con. Their main authority says you can't do that. So, and that leads me to my third point, which is about the major questions, doctor. And this is a major question. The court already said the vaccine mandate was a major question in Louisiana. I think this is a more straightforward one. And this is why. This was a centerpiece of a presidential campaign within all of our memory. We all remember this. This happened. We can remember, you can go back and you can look at the news. This all happened. This was, you know, protests in the street. Seattle said, we're going to raise the minimum wage of $15 per hour. It was a national debate, a national discussion, uh, and it didn't, and they didn't do it. Uh, so this is certainly politically controversial. Are you drawing comparisons between the Louisiana case, the vaccine case in this case? Yes, your honor. And, and what, how are you saying they're similar? I'm saying they're similar because that court said, um, the court said that this is a major question because it's politically and economically significant. I am saying that this is also politically significant because it was the centerpiece of a presidential campaign and a massive debate in Congress. Um, that's surely suggest that this is politically significant. But you're not suggesting that something can be both political, but then beneficial to, to, to citizens, to workers. No, your honor. Of course not. All right. What I am saying is for purposes of the major questions doctrine, Congress gets to make those decisions. Congress said no here. Um, and this was a politically hot button issue. People talked about it. This wasn't like something in the weeds. This was something you can ask, you know, I can go home and I can ask my kids and my 16 year old has a view on the minimum wage. Uh, this is not something that is esoteric. This is something that was a big political deal. It's also economically significant. They say, you know, it's only $1.7 billion per year. Look at pages 21 and 20 to 21 of their reply brief. They admit that is an undercount. That is not true. Look at the language of the executive order and the rule. It's not just contractors, it's subcontractors and those who work in connection with a government contract. In that's what the sixth circuit said as well. But regardless, this court has said in BST holdings that even approximately $3 billion a year is a $3 billion total is enough to trigger the major questions doctrine. Well, here on their own numbers, it's $1.7 billion a year for a decade. Well, now we're at $17 billion under this court's precedent. That is enough. Now they don't like this court's precedent, you know, and that's a question. If they don't think that's consistent with the Supreme Court's precedent, they can ask for rehearing and bonk, or they can go to the U.S. Supreme Court. But this court held in BST holdings that approximately $3 billion is enough to trigger the major question doctrine. But one more part about the major question doctrine that I think is important, and this goes back to your question, Judge Clement. What is their limiting principle? In our brief, we raised a number of hypotheticals. One I want to focus on, we said, why under their theory couldn't a president say, I'm not going to have the United States contract with government contractors in a right-to-work or a pro-union state. It doesn't matter, take your pick, either one. Because the president could say, if you're using union labor, it's more expensive or higher quality. Again, take your pick. We can go either way. Why wouldn't that be okay under their reading? And I waited to see in their reply brief what they had to say about that. And I looked, and they didn't have an answer. And when they spoke to you, Judge Clement, they said, what are the limits? Well, they said, well, the president would have to think it's economical. Well, that is no limit at all under their reading. That would not prevent, you know, we're not going to contract in states that use fossil fuels, or contractors that don't have green energy. We're not going to do, pick any social policy you want. They could use the exact same argument that they're using here, plug and play, and get the same result that they're arguing here. But that's the what if. We know what we have here. All we're talking about here is a requirement that a minimum wage is paid. That's all we're talking about. Correct, Your Honor. So that's why I would point the court to the Supreme Court's major questions West Virginia, in particular. You look at the nature of the power being asserted, and whether there is a limiting principle. And they don't have such a limiting principle here. A few more points, if I may. They talk about surplusage. They say that our reading of the statute would render Section 121 surplusage. Notably, they ignore the brief of Georgia, the amicus brief in front of this court, where they say, look at Section 701 of the statute. Under the government's reading, that is completely surplusage. It does no work at all under the government's reading. They ignore that argument. They also have another surplusage problem, which is, what do you do with the fact that Congress has enacted other laws with minimum wage provisions for government contractors? Those provisions serve no work under their reading of the statute. And they say, ah, but there's not an actual conflict between the two. Well, we had an argument a couple months ago, MBONC, Wilson v. Midland County. The question there was, what does Pricer v. Rodriguez mean? That's the statute where you have the general 1983 and the specific federal habeas. There's no direct conflict between the two. But the Supreme Court said in Pricer, we have to harmonize them and read the more specific to control. That, I think, is dispositive of their argument here. They also talk about ratification. I urge the court, if there's nothing else, I urge the court to read the Sixth Circuit's decision last year in Commonwealth. It was written by Judge Joan Larson. She used to be a law professor at the University of Michigan, served for a long time on the Michigan Supreme Court. A very scholarly, careful argument, analysis. And she explains why the ratification argument simply doesn't work. And in particular, she cites a recent case from the Supreme Court, BP v. City of Baltimore, where the court said that a few circuit court decisions is not enough for ratification, especially when the text of the statute is clear. I'm paraphrasing. Read her analysis. Read the Supreme Court's decision in BP v. City of Baltimore. Their ratification argument doesn't work. They also make a point about this is just proprietary authority. It's not regulatory authority. That argument is squarely contrary to the Supreme Court's decision last year in Biden v. Nebraska. What are student loans? Student loans are not regulatory. Student loans are proprietary. The United States issues loans. You pay back the loans. It's a proprietary relationship. And the Supreme Court said the major question doctrine still applies. I would also urge the court to look at Collins v. Yellen from 2021, also by the Supreme Court. I say that because in Collins, I was court-appointed amicus. The Supreme Court asked me to defend the Federal Housing Finance Agency. I made the exact same argument that he made today to the United States Supreme Court in my brief, where I said, surely there's a difference between the United States as regulator and the United States in a non-regulatory capacity. And the Supreme Court said, no. I thought it was a pretty good argument, too. I made the argument, and the Supreme Court said, no. That argument is foreclosed. So I don't think that argument works for them either. They also rely on this court's decisions from a long time ago in Knopsey v. Louisiana Power. A few responses to that, if I may. One, the Eleventh Circuit, which was also bound by those cases. Remember, of course, the Eleventh Circuit is bound by the pre-1981 cases of this court, just as this court is. And the Eleventh Circuit, in the opinion of the court, which is what the Eleventh Circuit itself calls Judge Grant's opinion, in the decision of the court, said, that's not confining here for a couple of reasons. One, because it was three sources of authority, the Procurement Act, Title VII, and the Equal Opportunities Act. The court then said it could rest on any one in particular. So I don't think that argument works for them. But the other point that I would like to make is, this is where the wage mandate is upside down. Anti-discrimination, this is Econ 101. Anti-discrimination lowers costs. If you discriminate, that means you're limiting the pool that you're working with, thus you're limiting supply. And we all know, if you keep supply the same, if you limit supply but keep demand the same, then you're going to raise prices. Here, it's the exact opposite. So I embrace the anti-discrimination cases. They're helpful to me. They're devastating to them, because they've turned the statute upside down. Finally, I only have a few more seconds left, and I'm happy to answer questions. I apologize if I have not answered any of the court's questions. They mentioned Bradford. I urge the court to look at Bradford. Bradford is out of the Tenth Circuit. The Tenth Circuit felt itself, as I read the decision, bound by a 2004 decision, the city of Albuquerque, to follow the D.C. Circuit test in Conn. This court is not so bound, as the court said in Louisiana just two years ago when it endorsed— But speaking of the Louisiana case— Yes. Talking about the vaccine case— Yes, Your Honor. Aside from that case, how many successful challenges have there been to an executive order issued under the Procurement Act? Sure. There's Louisiana. There's the three cases out in the Sixth Circuit, including Commonwealth and Kentucky. There's the Eleventh Circuit case, which we were just talking about. There's also the Fourth Circuit case from 1981, which further decimates the idea that there's been ratification, where the Fourth Circuit said, it's simply too attenuated. So I'm counting at least four or five. So the determination was that the executive order was invalid? Not that the executive order was invalid, but it was too attenuated to apply it to certain categories. Here, the same analysis of too attenuated would apply to the wage mandate. So I'm counting at least four or five cases right now shooting from the hip. Maybe I asked a bad question, so let me rephrase. How many challenges have there been, court challenges to executive orders based on the Procurement Act, where the executive order has been deemed invalid? Certainly the vaccine mandate, as we know. Not in the Fourth Circuit. I agree. The Fourth Circuit didn't say that the executive order was invalid, but they said that it could not be applied to a Liberty Mutual, which is not a small insurance company. But you're talking about one case, aren't we? No, Your Honor. I don't want to push too hard, but I'm going to include the Fourth Circuit case. So we're at least talking two across multiple circuits at this point. And the point is, it's an open question here. I read this court's decision in Louisiana to cast doubt on their statutory interpretation. All right. Thank you, counsel. Your clients are all Fifth Circuit states? Yes, Your Honor. Are there other states that filed similar lawsuits? I don't believe so, Your Honor. I'm trying to remember what happened in the Ninth Circuit. I don't think so. I think it is us. Now, we have 17 states in the Georgia brief. They all agree with us. So if this court were to agree with us, I suspect we'd get litigation pretty quick. But I don't believe so, Your Honor. Thank you. Thank you, Your Honor. And thank you for the extra time. I appreciate it. Thank you. Rebuttal. Thank you, Your Honors. I want to make four points. But first, Judge Clement, to your question, there's four other states that have challenged in the Ninth Circuit. That appeal was argued in February, a pending decision there. The four points I'd like to make, the first is on the interpretation of the statute. It's just not true that our interpretation is a textual, whatever you want to say about the D.C. Circuit's decision in 1979. Look at our brief. We go word by word through 121A. We look at the dictionary definitions of the word. Ours is the only definition that makes sense of the text, including the phrase. Consistent with, we're not relying on the statement of purpose as a source of operative authority. As this court recognized in Louisiana, the statement of purpose in 101 limits the authority set forth in Section 121A. It is one of the provisions with which exercises of that authority have to be consistent in all of the decisions about necessary and proper clauses that they cite. Those are about delegations of legislative authority, and they rest on principles that govern delegations of legislative authority. Those principles are not applicable to the recognition of the President's proprietary authority. And I would point the court to the language we cite in Justice Gorsuch's dissent in Gundy, which noted that Congress may assign the President broad authority regarding matters where he enjoys his own inherent article to the powers, including the management of the executive branch. The second point, this isn't a policy Congress refused to enact. What Congress refused to enact was a policy of paying a $15 minimum wage to every worker at every business in the country. This is several steps removed from that. This is a policy that the government is only going to contract with companies that will pay their workers the minimum wage for the particular hours that those workers work on or in connection with federal contracts. So it's a completely different policy. On the major questions doctrine, my third point, BST does not say $3 billion is enough to implicate the major questions doctrine. If you read the sentence in that opinion discussed at page 21 of our reply brief, it said four things. It said the agency was deriving its authority from an old statute employed in a novel manner. It involved broad medical considerations that lay outside of the agency's core competencies. It purported to definitively resolve one of the day's most hotly contested political issues. And it imposed $3 billion in costs. So the notion that that sentence says $3 billion implicates the major questions doctrine is just not true on Biden versus Nebraska. And I may be stating the obvious, but nobody has a right to have a government contract. Of course, your honor, that's also true. And that is one more reason that when the government is exercising truly proprietary power, when it is just saying, here are the terms on which we're going to do business with you, and here are the terms on which we won't, that is not a regulation. I was about to say about Biden versus Nebraska, this exact point. The reason the major questions is the reason what distinguishes the analysis there is we're not saying this is different because we're spending money. That was true in that case, too. We're saying it's different because this requirement is just governing the terms on which we're spending money. It's not trying to use our expenditure of money as leverage to get people to do unrelated things. The Supreme Court has drawn that distinction in NLRA preemption cases like Boston Harbor. The DC Circuit cites it in Building and Construction Trades versus Albaugh. Judge Anderson cites it in his 11th Circuit separate writing in the Georgia case. And finally, on economy and efficiency, he said this is some five-step tenuous action. I don't understand why it's so complicated. If you pay higher wages, you are likely to get higher quality workers. That is the theory. It's not complicated. He recognizes that there is plenty of studies on our side that say that. He thinks there's studies on his, too. But that is why Congress left it to the president as the manager of the executive branch to decide what, in his view, benefits the government. And that's what he's done here. And for that reason, we ask that the district court's injunction be reversed. Thank you, Your Honors. Thank you, Counsel. The court will take this matter under advisement.